STEVE W. BERMAN (*Pro Hac Vice* pending)
ANTHONY D. SHAPIRO (*Pro Hac Vice* pending)
HAGENS BERMAN SOBOL SHAPIRO LLP
1918 8th Avenue, Suite 3300
Seattle, WA 98101
Telephone: (206) 623-7292
Facsimile: (206) 623-0594
Email: steve@hbsslaw.com
Email: tony@hbsslaw.com
           -and-
JEFF D. FRIEDMAN (SBN 173886)
HAGENS BERMAN SOBOL SHAPIRO LLP
715 Hearst Avenue, Suite 202
Berkeley, CA 94710
Telephone: (510) 725-3000
Facsimile: (510) 725-3001
Email: jefff@hbsslaw.com

E-filing

*Counsel for the Proposed Classes*

# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

LUCHA BOTT, JANE M. TAYLOR AND
JUDE A. ANHELUK, Individually and on
Behalf of All Others Similarly Situated,

                                    Plaintiffs

v.

DELPHI AUTOMOTIVE LLP; FURUKAWA
ELECTRIC CO., LTD.; LEAR CORP.; LEONI
AG; SUMITOMO ELECTRIC INDUSTRIES,
LTD.; S-Y SYSTEMS TECHNOLOGIES
GMBH; YAZAKI CORP.; YAZAKI NORTH
AMERICA INC.,

                                    Defendants.

Case No.

CV 11 4949

CLASS ACTION

**CLASS ACTION COMPLAINT**

DEMAND FOR JURY TRIAL

000700-00 478497 V1

1

## TABLE OF CONTENTS

Page

I.      NATURE OF THE CASE ................................................................................................... 1

II.     JURISDICTION AND VENUE ........................................................................................ 2

III.    THE PARTIES .................................................................................................................. 3

        A.    Plaintiffs ................................................................................................................. 3

        B.    Defendants ............................................................................................................. 4

IV.     STATEMENT OF FACTS ................................................................................................ 5

        A.    Defendants increased prices for automotive wire harness systems despite steady
              costs ....................................................................................................................... 6

        B.    The structure and characteristics of the automotive wire harness systems market
              render the conspiracy more plausible ................................................................... 6

              1.    The automotive wire harness systems market has high barriers to entry .......... 7

              2.    There is inelasticity of demand for automotive wire harness systems .............. 7

              3.    The market for automotive wire harness systems is highly concentrated ......... 8

              4.    Defendants had ample opportunities to conspire ............................................. 8

        C.    Government investigations .................................................................................... 8

        D.    Guilty pleas .......................................................................................................... 10

V.      MANNER AND MEANS OF THE CONSPIRACY ...................................................... 12

VI.     TRADE AND COMMERCE .......................................................................................... 13

VII.    CLASS ACTION ALLEGATIONS ............................................................................... 13

VIII.   ANTITRUST INJURY ................................................................................................... 20

IX.     FRAUDULENT CONCEALMENT AND TOLLING ................................................... 20

X.      CAUSES OF ACTION ................................................................................................... 21

FIRST CAUSE OF ACTION  VIOLATION OF STATE ANTITRUST AND RESTRAINT OF
        TRADE LAWS ............................................................................................................... 21

SECOND CAUSE OF ACTION  UNJUST ENRICHMENT ....................................................... 23

XI.     PRAYER FOR RELIEF ................................................................................................. 24

XII.    DEMAND FOR JURY TRIAL ...................................................................................... 24

- i -

Indirect purchaser plaintiffs Lucha Bott, Jane M. Taylor and Jude A. Anheluk ("Plaintiffs") bring this action on behalf of all others similarly situated in the United States. Plaintiffs, by and through their attorneys, based on their individual experiences, the investigation of counsel and experts, and information and belief allege as follows:

## I. NATURE OF THE CASE

1. This lawsuit is brought as a proposed class action against Defendants, the largest suppliers of Automotive Wire Harness Systems (defined below) globally and in the United States, for engaging in a massive, decade-long conspiracy to unlawfully fix and artificially raise the prices of Automotive Wire Harness Systems. Defendants' conspiracy successfully targeted the long-struggling United States automotive industry, raising prices for car manufacturers and consumers alike.

2. Plaintiffs seek to represent consumers who purchased or leased new motor vehicles containing Automotive Wire Harness Systems or replacement Automotive Wire Harness Systems for their motor vehicles during the period from and including January 1, 2000, up to and including the date of the filing of this Complaint (the "Class Period").

3. "Automotive Wire Harness Systems" are automotive electrical distribution systems used to direct and control electronic components, wiring, and circuit boards in an automotive vehicle. Essentially, Automotive Wire Harness Systems serve as the "central nervous system" of a motor vehicle. "Automotive Wire Harness Systems" include the following: automotive electrical wiring, lead wire assemblies, cable bond, automotive wiring connectors, automotive wiring terminals, electronic control units, fuse boxes, relay boxes, junction blocks and power distributors.

4. Defendants Delphi Automotive LLP ("Delphi"), Furukawa Electric Co., Ltd. ("Furukawa"), Lear Corp. (''Lear''), Leoni AG ("Leoni"), Sumitomo Electric Industries, Ltd. (Sumitomo), S-Y Systems Technologies, GmbH ("S-Y Systems), Yazaki Corp., and Yazaki North America Inc. (collectively "Defendants") manufacture, market, and sell Automotive Wire Harness Systems throughout the United States. The manufacture and sale of Automotive Wire Harness Systems is a multi-billion dollar industry.

- 1 -

000700-00 478497 V1

5.      Defendants and other co-conspirators (as yet unknown) agreed, combined and conspired to inflate, fix, raise, maintain, or artificially stabilize prices of Automotive Wire Harness Systems.

6.      Competition authorities in the United States, the European Union and Japan have been investigating a conspiracy in the market for Automotive Wire Harness Systems since at least February 2010. As part of its criminal investigation, the United States Department of Justice ("DOJ") is seeking information about anticompetitive conduct in the market for Automotive Wire Harness Systems, and the Federal Bureau of Investigation ("FBI") has participated in raids, pursuant to search warrants, carried out in at least some of the Defendants' offices. The European Commission Competition Authority ("EC") has also conducted dawn raids at the European offices of several of the Defendants.

7.      Defendant Furukawa has pled guilty to a criminal information brought by the United States, charging that, from at least as early as January 2000 and continuing until at least January 2010, Furukawa and its co-conspirators participated in a combination and conspiracy to suppress and eliminate competition in the automotive parts industry by agreeing to rig bids for, and to fix, stabilize, and maintain the prices of, Automotive Wire Harness Systems sold to automobile manufacturers in the United States. The criminal information further charged that the combination and conspiracy engaged in by Furukawa and its co-conspirators was in unreasonable restraint of interstate and foreign trade and commerce in violation of the Sherman Antitrust Act, 15 U.S.C. § 1.

8.      As part of its plea agreement, Furukawa has agreed to assist the DOJ in its ongoing criminal investigation into the automotive parts industry.

9.      As a direct result of the anti-competitive and unlawful conduct alleged herein, Plaintiffs and the Classes paid artificially inflated prices for Automotive Wire Harness Systems during the Class Period and have thereby suffered antitrust injury to their business or property.

## II.     JURISDICTION AND VENUE

10.     This Court has jurisdiction over the instant matter pursuant 28 U.S.C. § 1332(d) and the Class Action Fairness Act of 2005 ("CAFA"), 28 U.S.C. § 1711, *et seq.*, which vest original jurisdiction in the district courts of the United States for any multi-state class action where the

- 2 -

1  aggregate amount in controversy exceeds $5 million and where the citizenship of any member of

2  the class of plaintiffs is different from that of any defendant. The $5 million amount-in-

3  controversy and diverse-citizenship requirements of CAFA are satisfied in this case.

4  11.  Venue is appropriate in this district under 28 U.S.C. § 1391(b) and (c), because

5  during the Class Period many of the Defendants transacted business, were found, or had agents in

6  this district and because a substantial portion of the affected interstate trade and commerce

7  described below has been carried out in this district.

8  12.  Intradistrict Assignment: Assignment to the San Francisco or Oakland division of

9  this Court is proper because a substantial portion of the events giving rise to the claims occurred

10  therein.

11  13.  This Court has personal jurisdiction over each Defendant because, inter alia, each

12  Defendant: (a) transacted business throughout the United States, including in this district;

13  (b) participated in the sale and distribution of Automotive Wire Harness Systems throughout the

14  United States, including in this district; (c) had substantial contacts with the United States,

15  including in this district; and/or (d) was engaged in an illegal conspiracy that was directed at and

16  had the intended effect of causing injury to persons residing in, located in, or doing business

17  throughout the United States, including in this district.

## III.  THE PARTIES

### A.  Plaintiffs

20  14.  Plaintiff Lucha Bott is a resident of Novato, California, and contracted to purchase a

21  2009 Honda CRV on April 9, 2009, from Honda of Marin, located in San Rafael, California.

22  15..  Plaintiff Jane M. Taylor is a resident of Kapaa, Hawaii. Plaintiff Taylor purchased a

23  2005 Toyota Prius on September 16, 2005, from Kauai Toyota, located in Lihue, Hawaii.

24  16.  Plaintiff Jude A. Anheluk is a resident of Minneapolis, Minnesota. Plaintiff Anheluk

25  purchased a 2008 Toyota Camry in December 2007, from Corwin Auto, located in Fargo, North

26  Dakota.

- 3 -

CLASS ACTION COMPLAINT

**B.** **Defendants**

17.     Defendant Delphi Automotive LLP is a Delaware corporation with its principal place of business in Troy, Michigan. Defendant Delphi manufactured, marketed and/or sold Automotive Wire Harness Systems that were purchased throughout the United States, including in this district, during the Class Period.

18.     Defendant Furukawa Electric Co., Ltd. is a Japanese corporation. Defendant Furukawa manufactured, marketed and/or sold Automotive Wire Harness Systems that were purchased throughout the United States, including in this district, during the Class Period.

19.     Defendant Lear Corp. is a Delaware corporation with its principal place of business in Southfield, Michigan. Defendant Lear manufactured, marketed and/or sold Automotive Wire Harness Systems that were purchased throughout the United. States, including in this district, during the Class Period.

20.     Defendant Leoni AG is a German corporation. Defendant Leoni manufactured, marketed and/or sold Automotive Wire Harness Systems that were purchased throughout the United States, including in this district, during the Class Period.

21.     Defendant Sumitomo Electric Industries, Ltd. is a Japanese corporation. Defendant Sumitomo manufactured, marketed and/or sold Automotive Wire Harness Systems that were purchased throughout the United States, including in this district, during the Class Period.

22.     Defendant S-Y Systems Technologies, GmbH is a German corporation. Defendant S-Y Systems manufactured, marketed and/or sold Automotive Wire Harness Systems that were purchased throughout the United States, including in this district, during the Class Period.

23.     Defendant Yazaki Corp. is a Japanese corporation. Defendant Yazaki manufactured, marketed and/or sold Automotive Wire Harness Systems that were purchased throughout the United States, including in this district, during the Class Period.

24.     Defendant Yazaki North America Inc. is an Illinois corporation and has its principal place of business in Canton Township, Michigan. It is a subsidiary of and owned and controlled by its parent, Yazaki Corp. Yazaki Corp. and Yazaki North America Inc. are herein referred to as "Yazaki."

- 4 -

1

## IV. STATEMENT OF FACTS

2

25. Defendants supplied automotive wire harnesses and related products to automobile

3 manufacturers for installation in vehicles manufactured and sold in the United States and

4 elsewhere. Defendants manufactured automotive wire harnesses and related products (a) in the

5 United States for installation in vehicles manufactured and sold in the United States, (b) in Japan

6 for export to the United States and installation in vehicles manufactured and sold in the United

7 States, and (c) in Japan for installation in vehicles manufactured in Japan for export to and sale in

8 the United States.

9 26. Automotive wire harnesses are automotive electrical distribution systems used to

10 direct and control electronic components, wiring, and circuit boards. The following are defined as

11 "related products" for purposes of Plaintiffs' allegations: automotive electrical wiring, lead wire

12 assemblies, cable bond, automotive wiring connectors, automotive wiring terminals, electronic

13 control units, fuse boxes, relay boxes, junction blocks, and power distributors. When purchasing

14 automotive wire harnesses and related products, automobile manufacturers issue Requests for

15 Quotation ("RFQs") to automotive parts suppliers on a model-by-model basis for model specific

16 parts. Automotive parts suppliers submit quotations, or bids, to the automobile manufacturers in

17 response to RFQs, and the automobile manufacturers award the business to the selected automotive

18 parts supplier for the lifespan of the model, which is usually four to six years. Typically, the

19 bidding process for a particular model begins approximately three years prior to the start of

20 production. Japanese automobile manufacturers procure parts for U.S.-manufactured vehicles both

21 in Japan and the United States.

22 27. From at least as early as January 2000 and continuing until at least January 2010,

23 the exact dates being unknown, Defendants participated in a combination and conspiracy to

24 suppress and eliminate competition in the automotive parts industry by agreeing to rig bids for, and

25 to fix, stabilize, and maintain the ·prices of, automotive wire harnesses and related products sold to

26 automobile manufacturers in the United States and elsewhere. The combination and conspiracy

27 engaged in by Defendants was in unreasonable restraint of interstate and foreign trade and

28 commerce.

- 5 -

28. The charged combination and conspiracy consisted of a continuing agreement, understanding, and concert of action among Defendants, the substantial terms of which were to rig bids for, and to fix, stabilize, and maintain the prices of, automotive wire harnesses and related products sold to automobile manufacturers in the United States and elsewhere.

**A.    Defendants increased prices for automotive wire harness systems despite steady costs**

29. In a competitive market, falling material and labor costs would lead to decreased prices because each competitor would be afraid that other competitors would attempt to take advantage of their lower costs to lower their prices in order to capture market share. The only economically rational action in such a situation is for each competitor to lower its own prices.

30. In a market where ostensible competitors have engaged in a conspiracy to fix prices, however, competitors do not lower prices even when faced with steady or decreasing input costs. Such price decreases are unnecessary because the conspirators know that they will not lose sales to lower-priced competitors.

31. The price of Automotive Wire Harness Systems increased during the Class Period, while major input costs virtually remained the same. In fact, according to research in China, Sumitomo and Furukawa own their own copper mines and effectively control their copper input costs. Copper is a major input cost component in the manufacture of Automotive Wire Harness Systems. In a competitive market, steady input costs should not have resulted in rising prices to Defendants' customers for Automotive Wire Harness Systems. Such anti-competitive price increases have resulted in Plaintiffs and members of the Classes paying supra-competitive prices.

**B.    The structure and characteristics of the automotive wire harness systems market render the conspiracy more plausible**

32. The structure and other characteristics of the Automotive Wire Harness Systems market in the United States are conducive to a price-fixing agreement, and have made collusion particularly attractive in this market. Specifically, the Automotive Wire Harness Systems market: (l) has high barriers to entry; (2) has inelasticity of demand; (3) is highly concentrated; and (4) is rife with opportunities to conspire.

- 6 -

**1.     The automotive wire harness systems market has high barriers to entry**

33.     A collusive arrangement that raises product prices above competitive levels would, under basic economic principles, attract new entrants seeking to benefit from the supracompetitive pricing. Where, however, there are significant barriers to entry, new entrants are less likely. Thus, barriers to entry help to facilitate the formation and maintenance of a cartel.

34.     There are substantial barriers that preclude, reduce or make more difficult entry into the Automotive Wire Harness Systems market. A new entrant into the business would face costly and lengthy start-up costs, including multi-million dollar costs associated with manufacturing plants and equipment, energy, transportation distribution infrastructure, skilled labor and long-standing customer relationships.

35.     In addition, the Original Equipment Manufacturers ("OEMs") cannot change Automotive Wire Harness Systems suppliers randomly after they choose one because the OEMs design the features of their vehicles so that the Automotive Wire Harness System it purchases for a vehicle is then integrated with the electronics, mechanics, thermal distribution and other features of the particular vehicle model. Thus, the design must be synergized by Automotive Wire Harness Systems manufacturers and OEMs. It would be difficult for a new market entrant to do so.

**2.     There is inelasticity of demand for automotive wire harness systems**

36.     "Elasticity" is a term used to describe the sensitivity of supply and demand to changes in one or the other. For example, demand is said to be "inelastic" if an increase in the price of a product results in only a small decline in the quantity sold of that product, if any. In other words, customers have nowhere to turn for alternative, cheaper products of similar quality, and so continue to purchase despite a price increase.

37.     For a cartel to profit from raising prices above competitive levels, demand must be relatively inelastic at competitive prices. Otherwise, increased prices would result in declining sales, revenues and profits, as customers purchased substitute products or declined to buy altogether. Inelastic demand is a market characteristic that facilitates collusion, allowing producers to raise their prices without triggering customer substitution and lost sales revenue.

- 7 -

1    38.    Demand for Automotive Wire Harness Systems is highly inelastic. Demand for
2    Automotive Wire Harness Systems is inelastic because there are no close substitutes for these
3    products. In addition, customers must purchase Automotive Wire Harness Systems as an essential
4    part of a vehicle, even if the prices are kept at a supra-competitive level.

5    **3.    The market for automotive wire harness systems is highly concentrated**

6    39.    A highly concentrated market is more susceptible to collusion and other
7    anticompetitive practices.

8    40.    As discussed above, Defendants dominate the Automotive Wire Harness Systems
9    market. Six of the Defendants control almost 90% of the global market, and four of the Defendants
10   control almost 77% of the global market: Yazaki controls almost 30%; Sumitomo controls 24%;
11   Delphi controls 16.71%; Lear controls almost 5%; Furukawa controls almost 4%; and Leoni
12   controls 6%.

13   **4.    Defendants had ample opportunities to conspire**

14   41.    Defendants attended industry events where they had the opportunity to meet, have
15   improper discussions under the guise of legitimate business contacts, and perform acts necessary
16   for the operation and furtherance of the conspiracy. For example, Defendants have regularly
17   attended the annual Detroit Auto Show, which provided the means and opportunity to further the
18   conspiracy alleged herein.

19   **C.    Government investigations**

20   42.    A globally coordinated antitrust investigation is taking place in the United States,
21   Europe and Japan, aimed at suppliers of Automotive Wire Harness Systems.

22   43.    The probe originated in Europe as the result of several European OEMs coming
23   together to bring a complaint to the EC. One carmaker is said to have failed to attract competitive
24   bids for Automotive Wire Harness Systems, leading the company to join with other carmakers to
25   take their complaint to the EC.

26   44.    On February 8, 2010, the EC executed surprise raids at the European offices of
27   certain Defendants as part of an investigation into anti-competitive conduct related to the
28   manufacturing and sale of Automotive Wire Harness Systems. The EC also carried out additional

- 8 -

000700-00 478497 V1

1    raids at the European offices of several suppliers of Automotive Wire Harness Systems on June 7,

2    2010. Specifically, BC investigators raided the offices of Leoni, S-Y Systems and Yazaki. "The

3    Commission has reason to believe that the companies concerned may have violated European

4    Union antitrust rules that prohibit cartels and restrictive business practices," an EC official said in a

5    statement.

6        45.    S-Y Systems has admitted that it is cooperating with the antitrust investigators.

7    Lear's Chief Executive Officer Bob Rossiter has stated that Lear was notified by the EC that it is

8    part of an investigation into anticompetitive practices among automotive electrical and electric

9    component suppliers. In addition, Delphi has admitted to having "received a request for

10   information from antitrust authorities at the European Commission seeking information about

11   conduct by us in connection with an investigation in the European Union related to the electrical

12   and electronic components market." Delphi stated that it is cooperating fully with the European

13   competition authorities. Leoni has also stated that it is cooperating with the antitrust investigators.

14       46.    In February 2010, Japan's Fair Trade Commission raided the Tokyo offices of

15   Furukawa, Sumitomo and Yazaki as part of an expansive investigation into collusion in the

16   industry dating back to at least 2003.

17       47.    The DOJ has stated that it is conducting an investigation of potential antitrust

18   activity and coordinating its investigation with antitrust regulators in Europe. "The antitrust

19   division is investigating the possibility of anticompetitive cartel conduct of automotive electronic

20   component suppliers," DOJ Spokeswoman Gina Talamona said.

21       48.    Indeed, on February 23, 2010, around the same time as the raids by the Japanese and

22   European competition authorities, investigators from the FBI raided three Detroit-area Japanese

23   auto parts makers as part of a federal antitrust investigation. The FBI executed warrants and

24   searched the offices of these companies, including Yazaki's subsidiary in Canton Township,

25   Michigan. Special Agent Sandra Berchtold said the affidavits supporting issuance of the warrants

26   were sealed in federal court.

27       49.    To obtain search warrants, the United States was legally required to have probable

28   cause, accepted by a magistrate, to believe that it would obtain evidence of an antitrust violation as

- 9 -

000700-00 478497 V1

1    a result of executing the search warrant – that is, the United States had to have evidence sufficient

2    to warrant a person of reasonable caution to believe that raiding the offices of a seemingly lawful

3    business would uncover evidence of antitrust violations and that claimed evidence must have been

4    examined and accepted by a magistrate. That belief, which was recounted in sworn affidavits or

5    testimony, must be grounded on reasonably trustworthy information.

**D.    Guilty pleas**

50.    On September 29, 2011, the DOJ announced that Defendant Furukawa had agreed

to plead guilty and to pay a \$200 million fine for its role in a criminal price-fixing and bid-rigging

conspiracy involving the sale of Automotive Wire Harness Systems to automobile manufacturers.

Three executives, who are Japanese nationals, also agreed to plead guilty and to serve prison time

in the United States ranging from a year and a day to 18 months.

51.    Furukawa is charged with price-fixing in violation of the Sherman Act.

52.    Furukawa has agreed to plead guilty for its role in a conspiracy to rig bids for and to

fix the prices of the sale of Automotive Wire Harnesses and related products sold to automobile

manufacturers in the United States and elsewhere. The DOJ announced in a press release that

Furukawa participated in the conspiracy from at least as early as January 2000, until at least

January 2010.

53.    The plea agreements are an outgrowth of the DOJ's first charges in its ongoing

international cartel investigation of price-fixing and bid-rigging in the auto parts industry.

According to four separate one-count felony charges filed in the Unites States District Court for the

Eastern District of Michigan in Detroit, Furukawa and its executives – Junichi Funo, Hirotsugu

Nagata and Tetsuya Ukai – engaged in a conspiracy to rig bids for and to fix, stabilize and maintain

the prices of Automotive Wire Harness Systems sold to customers in the United States and

elsewhere.

54.    According to the Information filed, Furukawa and its co-conspirators carried out the

conspiracy by:

- 10 -

1         (a)     participating in meetings, conversations and communications in the United

2 States and Japan to discuss the bids and price quotations to be submitted to automobile

3 manufacturers in the United States and elsewhere;

4         (b)     agreeing, during those meetings, conversations and communications, on bids

5 and price quotations to be submitted to automobile manufacturers in the United States and

6 elsewhere;

7         (c)     agreeing, during those meetings, conversations and communications, to

8 allocate the supply of Automotive Wire Harness Systems sold to automobile manufacturers in the

9 United States and elsewhere on a model-by-model basis;

10         (d)     agreeing, during those meetings, conversations and communications, to

11 coordinate price adjustments requested by automobile manufacturers in the United States and

12 elsewhere;

13         (e)     submitting bids, price quotations, and price adjustments to automobile

14 manufacturers in the United States and elsewhere in accordance with the agreements reached;

15         (f)     selling Automotive Wire Harness Systems to automobile manufacturers in

16 the United States and elsewhere at collusive and noncompetitive prices;

17         (g)     accepting payment for Automotive Wire Harness Systems sold to

18 automobile manufacturers in the United States and elsewhere at collusive and noncompetitive

19 prices;

20         (h)     engaging in meetings, conversations, and communications in the United

21 States and elsewhere for the purpose of monitoring and enforcing adherence to the agreed-upon

22 bid-rigging and price-fixing scheme; and

23         (i)     employing measures to keep their conduct secret, including but not limited

24 to using code names and meeting at private residences or remote locations.

25     55.     "As a result of this international price-fixing and bid-rigging conspiracy, automobile

26 manufacturers paid noncompetitive and higher prices for parts in cars sold to U.S. consumers," said

27 Sharis A. Pozen, Acting Assistant Attorney General in charge of the Department of Justice's

28 Antitrust Division. "This cartel harmed an important industry in our nation's economy, and the

- 11 -

1    Antitrust Division with the Federal Bureau of Investigation will continue to work together to

2    ensure that these kinds of conspiracies are stopped."

3        56.    "When companies partner to control price and fix bids or contracts, it undermines

4    the foundation of the United States' economic system," said FBI's Special Agent in Charge

5    Andrew G. Arena. "The FBI is committed to aggressively pursuing any company involved in

6    antitrust crimes." According to the plea agreements, which are subject to court approval,

7    Furukawa, Funo, Nagata and Ukai have all agreed to assist in the government's ongoing

8    investigation into the automotive parts industry.

9                    **V.    MANNER AND MEANS OF THE CONSPIRACY**

10       57.    For purposes of forming and carrying out the charged combination and conspiracy,

11   Defendants did those things that they combined and conspired to do, including, among other

12   things:

13            a.    participating in meetings, conversations and communications in the United

14   States and Japan to discuss the bids and price quotations to be submitted to automobile

15   manufacturers in the United States and elsewhere;

16            b.    agreeing, during those meetings, conversations and communications, on bids

17   and price quotations to be submitted to automobile manufacturers in the United States and

18   elsewhere;

19            c.    agreeing, during those meetings, conversations and communications, to

20   allocate the supply of automotive wire harnesses and related products sold to automobile

21   manufacturers in the United States and elsewhere on a model-by-model basis;

22            d.    agreeing, during those meetings, conversations and communications, to

23   coordinate price adjustments requested by automobile manufacturers in the United States and

24   elsewhere;

25            e.    submitting bids, price quotations, and price adjustments to automobile

26   manufacturers in the United States and elsewhere in accordance with the agreements reached;

27            f.    selling automotive wire harnesses and related products to automobile

28   manufacturers in the United States and elsewhere at collusive and noncompetitive prices;

- 12 -

1            g.      accepting payment for automotive wire harnesses and related products sold

2    to automobile manufacturers in the United States and elsewhere at collusive and noncompetitive

3    prices;

4            h.      engaging in meetings, conversations and communications in the United

5    States and elsewhere for the purpose of monitoring and enforcing adherence to the agreed-upon

6    bid-rigging and price-fixing scheme; and

7            i.      employing measures to keep their conduct secret, including but not limited

8    to using code names and meeting at private residences or remote locations.

9                   **VI.    TRADE AND COMMERCE**

10       58.     During the period covered by this Complaint, Defendants sold to automobile

11   manufacturers located in various states in the United States substantial quantities of automotive

12   wire harnesses and related products shipped from outside the United States and from other states in

13   a continuous and uninterrupted flow of interstate and foreign trade and commerce. In addition,

14   substantial quantities of equipment and supplies necessary to the production and distribution of

15   automotive wire harnesses and related products by Defendants, as well as payments for automotive

16   wire harnesses and related products sold by Defendants, traveled in interstate and foreign trade and

17   commerce. The business activities of Defendants in connection with the production and sale of

18   automotive wire harnesses and related products that were the subject of the charged conspiracy

19   were within the flow of, and substantially affected, interstate and foreign trade and commerce.

20                **VII.    CLASS ACTION ALLEGATIONS**

21       59.     Plaintiffs bring this action on behalf of themselves and as a class action under Rule

22   23(a) and (b)(2) of the Federal Rules of Civil Procedure, seeking equitable and injunctive relief on

23   behalf of the following class (the "Nationwide Class"):

24                   All persons and entities that indirectly purchased, during the Class
                Period, Automotive Wire Harness Systems, for personal use and not

25                   for resale, including as a stand-alone replacement product or as a
                component of a new motor vehicle from any Defendant or any

26                   current or former subsidiary or affiliate thereof, or any co-
                conspirator.

27

28
                                    - 13 -

60.     Plaintiffs also bring this action on behalf of themselves and as a class action under

Rule 23(a) and (b)(3) of the Federal Rules of Civil Procedure seeking damages pursuant to the state

antitrust, unfair competition, and consumer protection laws on behalf of the following class (the

"Indirect Purchasers Class"):

> All persons and entities that indirectly purchased, during the Class
> Period, Automotive Wire Harness Systems, for personal use and not
> for resale, including as a stand-alone replacement product or as a
> component of a new motor vehicle from any Defendant or any
> current or former subsidiary or affiliate thereof, or any co-
> conspirator.

61.     The Nationwide Class and the Indirect Purchasers Class are referred to herein as the

"Classes." Excluded from the Classes are Defendants, their parent companies, subsidiaries and

affiliates, any co-conspirators, federal governmental entities and instrumentalities of the federal

government, states and their subdivisions, agencies and instrumentalities, and persons who

purchased Automotive Wire Harness Systems directly or for resale.

62.     While Plaintiffs do not know the exact number of the members of the Classes,

Plaintiffs believe there are hundreds of thousands of members in each Class.

63.     Common questions of law and fact exist as to all members of the Classes. This is

particularly true given the nature of Defendants' conspiracy, which was generally applicable to all

the members of both Classes, thereby making appropriate relief with respect to the Classes as a

whole. Such questions of law and fact common to the Classes include, but are not limited to:

(a)     Whether Defendants engaged in a combination and conspiracy among

themselves to fix, raise, maintain or stabilize the prices of Automotive Wire Harness Systems sold

in the United States;

(b)     The identity of the participants of the alleged conspiracy;

(c)     The duration of the alleged conspiracy and the acts carried out by

Defendants in furtherance of the conspiracy;

(d)     Whether the alleged conspiracy violated the Sherman Act, as alleged in the

First Cause of Action;

- 14 -

000700-00 478497 V1

1    (e)    Whether the alleged conspiracy violated state antitrust and unfair

2    competition law, as alleged in the First Cause of Action;

3    (f)    Whether Defendants unjustly enriched themselves to the detriment of the

4    Plaintiffs and the members of the Classes, thereby entitling Plaintiffs and the members of the

5    Classes to disgorgement of all benefits derived by Defendants, as alleged in the Second Cause of

6    Action;

7    (g)    Whether the conducts of Defendants, as alleged in this Complaint, caused

8    injury to the business or property of Plaintiffs and the members of the Classes;

9    (h)    The effect of the alleged conspiracy on the prices of Automotive Wire

10   Harness Systems sold in the United States during the Class Period;

11   (i)    Whether the Defendants fraudulently concealed the conspiracy's existence

12   from the Plaintiffs and the members of the Classes;

13   (j)    The appropriate injunctive and related equitable relief for the Nationwide

14   Class; and

15   (k)    The appropriate class-wide measure of damages for the Damages Class.

16   64.    Plaintiffs' claims are typical of the claims of the members of the Classes, and

17   Plaintiffs will fairly and adequately protect the interests of the Classes. Plaintiffs and all members

18   of the Classes are similarly affected by Defendants' wrongful conduct in that they paid artificially

19   inflated prices for Automotive Wire Harnesses purchased indirectly from Defendants.

20   65.    Plaintiffs' claims arise out of the same common course of conduct giving rise to the

21   claims of the other members of the Classes. Plaintiffs' interests are coincident with, and not

22   antagonistic to, those of the other members of the Classes. Plaintiffs are represented by counsel

23   who are competent and experienced in the prosecution of antitrust and class action litigation.

24   66.    The questions of law and fact common to the members of the Classes predominate

25   over any questions affecting only individual members, including legal and factual issues relating to

26   liability and damages.

27   67.    Class action treatment is a superior method for the fair and efficient adjudication of

28   the controversy, in that, among other things, such treatment will permit a large number of similarly

- 15 -

CLASS ACTION COMPLAINT

1  situated persons to prosecute their common claims in a single forum simultaneously, efficiently and

2  without the unnecessary duplication of evidence, effort and expense that numerous individual

3  actions would engender. The benefits of proceeding through the class mechanism, including

4  providing injured persons or entities with a method for obtaining redress for claims that it might

5  not be practicable to pursue individually, substantially outweigh any difficulties that may arise in

6  management of this class action.

7       68.     The prosecution of separate actions by individual members of the Classes would

8  create a risk of inconsistent or varying adjudications, establishing incompatible standards of

9  conduct for Defendants.

10      69.     Plaintiffs bring the Indirect Class on behalf of all persons similarly situated pursuant

11  to Rule 23 of the Federal Rules of Civil Procedure and/or respective state statute(s), on behalf of all

12  members of the following classes (collectively, the "State Classes"):

13              (a)    **Arizona**: All persons who purchased for their own use and not for resale

14                     motor vehicles with wire harnesses manufactured by any defendant.

15              (b)    **California**: All persons who purchased for their own use and not for resale

16                     motor vehicles with wire harnesses manufactured by any defendant.

17              (c)    **District of Columbia**: All persons who purchased for their own use and not

18                     for resale motor vehicles with wire harnesses manufactured by any

19                     defendant.

20              (d)    **Florida**: All persons who purchased for their own use and not for resale

21                     motor vehicles with wire harnesses manufactured by any defendant.

22              (e)    **Illinois**: All persons who purchased for their own use and not for resale

23                     motor vehicles with wire harnesses manufactured by any defendant.

24              (f)    **Iowa**: All persons who purchased for their own use and not for resale motor

25                     vehicles with wire harnesses manufactured by any defendant.

26              (g)    **Kansas**: All persons who purchased for their own use and not for resale

27                     motor vehicles with wire harnesses manufactured by any defendant.

28

- 16 -

000700-00 478497 V1

1             (h)    **Maine**:  All persons who purchased for their own use and not for resale

2                        motor vehicles with wire harnesses manufactured by any defendant.

3             (i)    **Massachusetts**:  All persons who purchased for their own use and not for

4                        resale motor vehicles with wire harnesses manufactured by any defendant.

5             (j)    **Michigan**:  All persons who purchased for their own use and not for resale

6                        motor vehicles with wire harnesses manufactured by any defendant.

7             (k)    **Minnesota**:  All persons who purchased for their own use and not for resale

8                        motor vehicles with wire harnesses manufactured by any defendant.

9             (l)    **Mississippi**:  All persons who purchased for their own use and not for resale

10                     motor vehicles with wire harnesses manufactured by any defendant.

11            (m)    **Nebraska**:  All persons who purchased for their own use and not for resale

12                     motor vehicles with wire harnesses manufactured by any defendant.

13            (n)    **Nevada**:  All persons who purchased for their own use and not for resale

14                     motor vehicles with wire harnesses manufactured by any defendant.

15            (o)    **New Hampshire**:  All persons who purchased for their own use and not for

16                     resale motor vehicles with wire harnesses manufactured by any defendant.

17            (p)    **New Mexico**:  All persons who purchased for their own use and not for

18                     resale motor vehicles with wire harnesses manufactured by any defendant.

19            (q)    **New York**:  All persons who purchased for their own use and not for resale

20                     motor vehicles with wire harnesses manufactured by any defendant.

21            (r)    **North Carolina**:  All persons who purchased for their own use and not for

22                     resale motor vehicles with wire harnesses manufactured by any defendant.

23            (s)    **North Dakota**:  All persons who purchased for their own use and not for

24                     resale motor vehicles with wire harnesses manufactured by any defendant.

25            (t)    **Oregon**:  All persons who purchased for their own use and not for resale

26                     motor vehicles with wire harnesses manufactured by any defendant.

27            (u)    **South Carolina**:  All persons who purchased for their own use and not for

28                     resale motor vehicles with wire harnesses manufactured by any defendant.

- 17 -

000700-00 478497 VI

1

2

3

4

5

6

7

8

9

10

11

12

    (v)    **South Dakota**: All persons who purchased for their own use and not for resale motor vehicles with wire harnesses manufactured by any defendant.

    (w)    **Tennessee**: All persons who purchased for their own use and not for resale motor vehicles with wire harnesses manufactured by any defendant.

    (x)    **Utah**: All persons who purchased for their own use and not for resale motor vehicles with wire harnesses manufactured by any defendant.

    (y)    **Vermont**: All persons who purchased for their own use and not for resale motor vehicles with wire harnesses manufactured by any defendant.

    (z)    **West Virginia**: All persons who purchased for their own use and not for resale motor vehicles with wire harnesses manufactured by any defendant.

    (aa)    **Wisconsin**: All persons who purchased for their own use and not for resale motor vehicles with wire harnesses manufactured by any defendant.

13

14

15

16

17

18

Excluded from the State Classes are: (1) Defendants; (2) any entity in which Defendants have a controlling interest; (3) Defendants' officers, directors and employees; (4) Defendants' legal representatives, successors and assigns; and (5) the Court to which this case is assigned. The proposed State Classes are both ascertainable and share a well-defined community of interest in common questions of law and fact. Furthermore, this action satisfies the numerosity, commonality, typicality, adequacy, predominance and superiority requirements.

19

20

21

22

23

    70.    Plaintiffs do not know the exact number of Class members at the present time. However, due to the nature of the trade and commerce involved, there are many thousands of class members, geographically dispersed throughout the nation such that joinder of all Class members is impracticable. Included in each state class are purchasers of new cars containing Automotive Wire Harness Systems for personal use.

24

25

26

    71.    The common legal and factual questions, which do not vary from Class member to Class member, and which may be determined without reference to individual circumstances of any Class member include, but are not limited to, the following:

27

28

    (a)    Whether Defendants engaged in a contract, combination or conspiracy to raise, stabilize, fix and/or maintain prices of Automotive Wire Harness Systems;

- 18 -

1               (b)    The duration and extent of the alleged contract, combination or conspiracy;

2               (c)    Whether Defendants were participants in the contract, combination or

3  conspiracy alleged herein;

4               (d)    The effect of the contract, combination or conspiracy on the prices of

5  Automotive Wire Harness System in the United States during the Class Period;

6               (e)    Whether the conduct of Defendants caused injury to Plaintiffs and other

7  members of the State Classes;

8               (f)    Whether the alleged contract, combination or conspiracy violated state

9  antitrust statutes; and

10              (g)    Whether the alleged conduct violated the common law of unjust enrichment.

11      72.    Questions of law and fact common to members of the State Classes predominate

12  over any questions which may affect only individual members.

13      73.    Plaintiffs' claims are typical of the claims of the Class, and Plaintiffs will fairly and

14  adequately protect the interests of the State Classes. Plaintiffs' interests are not antagonistic to the

15  claims of the other Class members, and there are no material conflicts with any other member of

16  the State Classes that would make class certification inappropriate. Plaintiffs have retained

17  competent counsel experienced in complex antitrust and consumer protection class action litigation

18  and will prosecute this action vigorously.

19      74.    A class action is superior to other available methods for the fair and efficient

20  adjudication of this controversy because individual litigation of the claims of all Class members is

21  impracticable. Even if every Class member could afford individual litigation, the court system

22  could not. It would be unduly burdensome on the courts if individual litigation of numerous cases

23  would proceed. By contrast, the conduct of this action as a class action, with respect to some or all

24  of the issues presented in this Complaint, presents fewer management difficulties, conserves the

25  resources of the parties and of the court system, and protects the rights of each Class member.

26      75.    Prosecution of separate actions by individual Class members would create the risk

27  of inconsistent or varying adjudications, establishing incompatible standards of conduct for

28

000700-00 478497 V1

1   Defendants, and would magnify the delay and expense to all parties and to the court system

2   resulting from multiple trials of the same complex factual issues.

3       76.     Whatever difficulties may exist in the management of the class action will be

4   greatly outweighed by the benefits of the class action procedure, including, but not limited to,

5   providing Class members with a method for the redress of claims that may not otherwise warrant

6   individual litigation.

7                           **VIII.   ANTITRUST INJURY**

8       77.     The effect of Defendants' conduct as described herein has been to artificially inflate

9   the prices of Automotive Wire Harness Systems and the price paid by Class members for new cars

10  in the United States.

11                      **IX.    FRAUDULENT CONCEALMENT AND TOLLING**

12      78.     Throughout the Class Period, Defendants engaged in a successful, illegal price-

13  fixing and supply control conspiracy that was self-concealing. Defendants effectively,

14  affirmatively and fraudulently concealed their unlawful combination, conspiracy and acts in

15  furtherance thereof from Plaintiffs and the members of the Classes.

16      79.     Plaintiffs did not know nor could they have known that the prices for Automotive

17  Wire Harness Systems were artificially inflated and maintained by virtue of Defendants' illegal

18  price-fixing and supply control conspiracy, and that Plaintiffs and members of the Classes were

19  paying higher prices.

20      80.     Plaintiffs have exercised due diligence by promptly investigating the facts giving

21  rise to the claims asserted herein upon having reasonable suspicion of the existence of Defendants'

22  conspiracy.

23      81.     As a result of Defendants' fraudulent concealment of their conspiracy, the running

24  of any statute of limitations has been tolled with respect to any claims that Plaintiffs and the Class

25  members have as a result of the anticompetitive conduct alleged in this Complaint.

26

27

28

- 20 -

CLASS ACTION COMPLAINT

## X.    CAUSES OF ACTION

### FIRST CAUSE OF ACTION

### VIOLATION OF STATE ANTITRUST AND RESTRAINT OF TRADE LAWS

82.    Plaintiffs incorporate and reallege, as though fully set forth herein, each of the paragraphs set forth above.

83.    In response to market conditions, and in an effort to supracompetitively inflate the prices of Automotive Wire Harness Systems, Defendants engaged in a continuing contract, combination and conspiracy in restraint of interstate trade and commerce, which had the purpose and effect of fixing, raising, maintaining and/or stabilizing the price of Automotive Wire Harness Systems at artificially high, non-competitive levels in the United States.

84.    The conspiracy had its intended effect, as Defendants benefitted from selling Automotive Wire Harness Systems at supra-competitive prices.

85.    For the purposes of effectuating the aforesaid contract, combination and conspiracy, Defendants:

(a)    agreed among themselves to fix, raise, maintain and/or stabilize the prices of Automotive Wire Harness Systems in the United States;

(b)    agreed among themselves to restrict the supply of Automotive Wire Harness Systems by implementing bid-rigging and coordinating their actions; and

(c)    agreed among themselves to implement supracompetitive increases in the prices of Automotive Wire Harness Systems in the United States.

86.    As a result of Defendants' unlawful conduct, Plaintiffs and the other members of the State Classes have been injured in their business and property in that they have paid more for cars including Automotive Wire Harness Systems than they otherwise would have paid in the absence of Defendants' unlawful conduct.

87.    By reason of the foregoing, Defendants have violated Arizona Revised Statutes §§ 44-1401, *et seq*.

88.    By reason of the foregoing, Defendants have violated California Business and Professions Code §§ 16720, *et seq*.

- 21 -

1      89.    By reason of the foregoing, Defendants have violated District of Columbia Code

2  Annotated §§ 28-4501, *et seq.*

3      90.    By reason of the foregoing, Defendants have violated the Florida Deceptive and

4  Unfair Trade Practices Act, Fla. Stat. §§ 501.201, *et seq.*

5      91.    By reason of the foregoing, Defendants have violated the Illinois Antitrust Act,

6  Illinois Compiled Statutes, §§ 740 Ill. Comp. Stat. 10/1, *et seq.*

7      92.    By reason of the foregoing, Defendants have violated Iowa Code §§ 553.1, *et seq.*

8      93.    By reason of the foregoing, Defendants have violated Kansas Statutes Annotated

9  §§ 50-101, *et seq.*

10      94.    By reason of the foregoing, Defendants have violated the Maine Revised Statutes 10

11  M.R.S. §§ 1101, *et seq.*

12      95.    By reason of the foregoing, Defendants have violated Michigan Compiled Laws

13  Annotated §§ 445.771, *et seq.*

14      96.    By reason of the foregoing, Defendants have violated Minnesota Annotated Statutes

15  §§ 325D.49, *et seq.*

16      97.    By reason of the foregoing, Defendants have violated Mississippi Code Annotated

17  §§ 75-21-1, *et seq.*

18      98.    By reason of the foregoing, Defendants have violated Nebraska Revised Statutes

19  §§ 59-801, *et seq.*

20      99.    By reason of the foregoing, Defendants have violated Nevada Revised Statutes

21  Annotated §§ 598A.010, *et seq.*

22      100.    By reason of the foregoing, Defendants have violated New Mexico Statutes

23  Annotated §§ 57-1-1, *et seq.*

24      101.    By reason of the foregoing, Defendants have violated New Hampshire Revised

25  Statutes §§ 356:1, *et seq.*

26      102.    By reason of the foregoing, Defendants have violated New York General Business

27  Laws §§ 340, *et seq.*

28

- 22 -

000700-00 478497 V1

1    103.    By reason of the foregoing, Defendants have violated North Carolina General

2  Statutes §§ 75-1, *et seq.*

3    104.    By reason of the foregoing, Defendants have violated North Dakota Century Code

4  §§ 51-08.1-01, *et seq.*

5    105.    By reason of the foregoing, Defendants have violated Oregon Revised Statutes

6  §§ 646.705, *et seq.*

7    106.    By reason of the foregoing, Defendants have violated South Carolina's Unfair Trade

8  Practices Act, S.C. Code Ann. §§ 39-5-10, *et seq.*

9    107.    By reason of the foregoing, Defendants have violated South Dakota Codified Laws

10  §§ 37-1-3.1, *et seq.*

11    108.    By reason of the foregoing, Defendants have violated Tennessee Code Annotated

12  §§ 47-25-101, *et seq.*

13    109.    By reason of the foregoing, Defendants have violated Utah Code Annotated §§ 76-

14  10-911, *et seq.*

15    110.    By reason of the foregoing, Defendants have violated Vermont Stat. Ann. 9

16  §§ 2451, *et seq.*

17    111.    By reason of the foregoing, Defendants have violated West Virginia Code §§ 47-18-

18  1, *et seq.*

19    112.    By reason of the foregoing, Defendants have violated Wisconsin Statutes §§ 133.01,

20  *et seq.*[1]

21                     **SECOND CAUSE OF ACTION**

22                        **UNJUST ENRICHMENT**

23    113.    Plaintiffs incorporate and reallege, as though fully set forth herein, each of the

24  paragraphs set forth above.

25    114.    To the detriment of Plaintiffs and Class members, Defendants have been and

26  continue to be unjustly enriched as a result of the unlawful and/or wrongful conduct alleged herein.

27  _____

28  [1] A demand letter will be sent under Massachusetts General Law Annotated Chapter 93A, *et seq.*, and an amendment adding claims under that law will be made in 30 days if necessary.

- 23 -

000700-00 478497 V1

1     Defendants have unjustly benefited by receiving higher prices for Automotive Wire Harness

2     Systems, which higher prices were passed along to consumers, and would otherwise not have been

3     possible absent the unlawful and/or wrongful conduct.

4     115.    Between the parties, it would be unjust for Defendants to retain the benefits attained

5     by their actions. Accordingly, Plaintiffs and Class members seek full restitution of Defendants'

6     enrichment, benefits and ill-gotten gains acquired as a result of the unlawful and/or wrongful

7     conduct alleged herein.

8                         **XI.    PRAYER FOR RELIEF**

9     WHEREFORE, Plaintiffs and Class members pray for relief as set forth below:

10     A.    Certification of the action as a class action pursuant to Federal Rule of Civil

11     Procedure 23, and appointment of Plaintiffs as Class Representatives and their counsel of record as

12     Class Counsel;

13     B.    A declaration that Defendants' conduct constituted an unlawful restraint of trade in

14     violation of the state statutes alleged herein and that Defendants are liable for the conduct or

15     damage inflicted by any other co-conspirator;

16     C.    Restitution and/or damages to Class members for their purchases of cars containing

17     Automotive Wire Harness Systems at inflated prices;

18     D.    Actual damages, statutory damages, punitive or treble damages, and such other

19     relief as provided by the statutes cited herein;

20     E.    Pre-judgment and post-judgment interest on such monetary relief;

21     F.    Equitable relief in the form of restitution and/or disgorgement of all unlawful or

22     illegal profits received by Defendants as a result of the anticompetitive conduct alleged in herein;

23     G.    The costs of bringing this suit, including reasonable attorneys' fees; and

24     H.    All other relief to which Plaintiffs and Class members may be entitled at law or in

25     equity.

26                        **XII.    DEMAND FOR JURY TRIAL**

27     Plaintiffs on behalf of themselves and all others similarly situated hereby request a jury trial

28     on any and all claims so triable.

- 24 -

CLASS ACTION COMPLAINT

1   DATED: October 6, 2011.

2                                        Steve W. Berman
                                         Anthony D. Shapiro
3                                        George W. Sampson
                                         HAGENS BERMAN SOBOL SHAPIRO LLP
4                                        1918 Eighth Avenue, Suite 3300
                                         Seattle, WA 98101
5                                        Telephone: (206) 623-7292
                                         steve@hbsslaw.com
6                                        george@hbsslaw.com

7
                                         By
8                                               Jeff D. Friedman (SBN 173886)
                                         HAGENS BERMAN SOBOL SHAPIRO LLP
9                                        715 Hearst Avenue, Suite 202
                                         Berkeley, CA 94710
10                                       Telephone: (510) 725-3000
                                         jefff@hbsslaw.com
11
                                         Elizabeth A. Fegan
12                                       HAGENS BERMAN SOBOL SHAPIRO LLP
                                         820 North Boulevard, Suite B
13                                       Oak Park, IL 60301
                                         Telephone: (708)776-5604
14                                       Facsimile: (708) 776-5601
                                         beth@hbsslaw.com
15
                                         *Attorneys for Plaintiffs and the Proposed Classes*
16

17

18

19

20

21

22

23

24

25

26

27

28
                                         - 25 -
                                    CLASS ACTION COMPLAINT
000700-00 478497 V1